# EXHIBIT

# "C"

Case 2:09-cv-01279-PGS-ES   Document 28-5   Filed 05/09/11   Page 2 of 24 PageID: 211

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2                       (NEWARK VICINAGE)

 3                            CASE NO. 09-1279 (PGS)

 4    MARK STEVENS,                    :

 5              Plaintiff,             :   Deposition of:

 6         v.                          :   SILAS SMITH

 7    CITY OF NEWARK POLICE DEPARTMENT,:
      and in both their individual and
 8    professional capacity, POLICE    :
      OFFICER SILAS SMITH, JR., POLICE
 9    OFFICER CARLOS ALVARADO, POLICE  :
      OFFICER ANTHONY VENANCIO, POLICE
10    OFFICER NEIVES, POLICE CHIEF     :
      ANTHONY S. CAMPOS, ABC CORPS 1-20
11    (said names being fictitious)    :
      JOHN DOES 1-20, (said names
12    being fictitious,                :

13              Defendants.            :
      _____/
14

15         TRANSCRIPT of testimony as taken by and before

16    LINDA M. SCHAAL, a Certified Court Reporter, and

17    Notary Public of the State of New Jersey, at the

18    offices of CITY OF NEWARK LAW DEPARTMENT, 920 Broad

19    Street, Newark, New Jersey, on Tuesday, May 4, 2010,

20    commencing at 12:15 p.m.

21
                     MONIQUE VOUTHOURIS, CCR
22                     IN CONJUNCTION WITH
                     BENDISH REPORTING, INC.
23                  CERTIFIED COURT REPORTERS
                       FAIRFIELD COMMONS
24              271 ROUTE 46 WEST - SUITE D204
                    FAIRFIELD, NEW JERSEY 07004
25                        973-244-1911
```

10:16:50

Case 2:09-cv-01279-PGS-ES   Document 28-5   Filed 05/09/11   Page 3 of 24 PageID: 212

2

```
 1   A P P E A R A N C E S:

 2
         LAW OFFICE OF JOSEPH A. MASSOOD
 3       50 Packanack Lake Road
         Wayne, New Jersey  07470-6663
 4       BY:  ANDREW R. BRONSNICK, ESQ.
         For the Plaintiff
 5
         CITY OF NEWARK LAW DEPARTMENT
 6       920 Broad Street
         Newark, New Jersey  07102
 7       BY:  AVION M. BENJAMIN, ESQ.
         For the Defendants
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                        I N D E X

2    WITNESS                                          PAGE

3    SILAS SMITH

4        Examination by Mr. Bronsnick                  4

5

6

7

8

9

10

11                    E X H I B I T S

12   IDENT.          DESCRIPTION                       PAGE

13                   (NONE)

14

15

16

17

18

19

20

21

22

23

24

25

**4**

1   S I L A S   S M I T H, J R., sworn.
2   EXAMINATION BY MR. BRONSNICK:
3       Q.      Sir, what is your current rank?
4       A.      Detective central narcotics.
5       Q.      Can you provide your full name to the
6   reporter, please?
7       A.      Silas, S-i-l-a-s, Smith, Jr.
8       Q.      Detective Smith, we're here today for
9   the purpose of your deposition.  Have you ever had
10  your deposition taken before?
11      A.      Yes, I have.
12      Q.      On how many occasions?
13      A.      Maybe two.
14      Q.      So do you need me to go through the
15  instructions?
16      A.      Not at all.
17      Q.      The only thing I will tell you is if
18  you for some reason you don't understand a question
19  that I ask, please tell me you don't understand a
20  word, what I said or I mumble.
21      A.      I have no problem doing that.
22      Q.      Because if you do answer a question
23  that I asked you, I'm going to assume that you
24  understood it.
25      A.      I totally understand.

**5**

1       Q.      Who are you currently employed by?
2       A.      City of Newark Police Department and
3   that's the Narcotic Gang Enforcement Division.
4       Q.      How long have you been a detective?
5       A.      Five-and-a-half years.  I was with
6   the Fugitive Task Force three-and-a-half and now two
7   with narcotic and gang.
8       Q.      Prior to being detective what was
9   your rank?
10      A.      Police officer detailed to the Street
11  Crimes Unit where this incident took place.
12      Q.      Do you remember what year it was,
13  month or year that you became a detective?
14      A.      Well, first I was a detective, went
15  back to patrolman and now I'm a detective again.
16      Q.      So before being a detective with the
17  Fugitive Task Force --
18      A.      I came to the Street Crimes Unit
19  where this incident took place and then I got pulled
20  into narcotics.
21      Q.      Is there a reason you went from being
22  a detective back to the Street Crimes Unit?
23      A.      It was a change during election time.
24  They were restructuring different departments and
25  the lieutenant that took over that section or

**6**

1   captain ordered his own group.
2       Q.      Ordered his own group for which?
3       A.      Fugitive Task Force.
4       Q.      Because you were on Fugitive Task
5   Force and someone new came in and they took you out
6   of the Fugitive Task Force?
7       A.      And they bring their own group in
8   that they're familiar with.
9       Q.      During the time that you were in the
10  Street Crimes Unit was your rank still detective?
11      A.      No, back to patrolman.
12      Q.      Does being a detective affect your
13  salary in any way?
14      A.      Just slightly.  Certain perks, gas
15  allotment and some uniform.
16      Q.      But not actual base salary?
17      A.      Not at all.
18      Q.      During the incident in question here
19  involving Mark Stevens, March 24, 2007, during that
20  time you were a patrolman with the Street Crimes
21  Unit?
22      A.      Yes.
23      Q.      Prior to being a detective in the
24  Fugitive Task Force what was your role?
25      A.      I was a patrolman in the East

**7**

1   District which is the Third Precinct.
2       Q.      How long did you have that position?
3       A.      About a year-and-a-half.
4       Q.      How about prior to that?
5       A.      Prior to that I was suspended.
6       Q.      For how long?
7       A.      Approximately two years.
8       Q.      How about prior to that?
9       A.      Prior to that I was in the North
10  District where I got suspended from.
11      Q.      You were a patrolman?
12      A.      Yes.
13      Q.      How long were you a patrolman in the
14  North District?
15      A.      That was a year.
16      Q.      How about prior to that?
17      A.      Sheriff's Department.
18      Q.      That's a county job?
19      A.      Yes, I transferred from the Sheriff's
20  Department to the Newark Police Department in '97.
21      Q.      How long were you with the Sheriff's
22  Department?
23      A.      One year.
24      Q.      Was that your first job after the
25  academy?

**8**

1      A.     No, no. I went from -- that was my
2 first law enforcement job, the Sheriff's Department,
3 and then I came to the Newark Police Department.
4      Q.     When did you go to the police
5 academy?
6      A.     '97. No, 3/98.
7      Q.     Is that when you graduated or that's
8 when you started?
9      A.     That's when I started.
10      Q.     You graduated July of '98?
11      A.     That's correct.
12      Q.     Were you in the police academy with
13 Sergeant Venancio?
14      A.     Yes.
15      Q.     Did you know him back then?
16      A.     Yes.
17      Q.     So after the police academy you were
18 a year at the Sheriff's Department?
19      A.     No, with the Sheriff's Department you
20 work for a year before you go to the police academy.
21 What happened is during that appointment when they
22 decided to pull me into the police academy from the
23 Sheriff's Department I got the phone call from
24 Newark. I was starting the police academy
25 department for the Sheriff's Department, left that

**9**

1 academy and transferred to Newark.
2      Q.     You don't need to go to the police
3 academy to work for the Sheriff's Department? Do
4 you have to go to the police academy to work at the
5 Sheriff's Department?
6      A.     To handle courts, no, and information
7 bureau, no. Anything handling prisoners that's when
8 you get sent. They use that as a probationary
9 period to see if you want the job from what I'm
10 hearing.
11      Q.     When you were with the Sheriff's
12 Department what were you doing?
13      A.     BCI. I handled all the records when
14 prisoners came in and prisoner intake logging and
15 courts.
16      Q.     Let's discuss the suspension for a
17 moment. What was the basis for the suspension?
18      A.     A child molester, Manuel Aleda was
19 caught having sex with a nine, ten-year-old boy. He
20 was brought into the precinct and once he was put in
21 the cell we found out later that the inmates beat
22 him up. Approximately two weeks later we were
23 called by Internal Affairs and asked if we knew
24 anything about it. We had no knowledge at that
25 point. The director at that time felt we were not

**10**

1 telling the truth.
2      Q.     Who was the director at that time?
3      A.     Santiago. I'm not sure of his first
4 name.
5      Q.     How long was he the director for?
6      A.     I think -- can I think?
7 Approximately '93 until about 2000, 2001, in that
8 area.
9      Q.     Was there an investigation during the
10 time that you were suspended?
11      A.     Yes.
12      Q.     That was done by Internal Affairs?
13      A.     That's correct.
14      Q.     Was there any action taken against
15 you other than that suspension?
16      A.     I was indicted on four counts.
17      Q.     What was the outcome from that
18 indictment?
19      A.     We went to trial and the charges were
20 dropped -- dismissed.
21      Q.     So a trial actually occurred?
22      A.     The trial occurred, six or seven week
23 trial with a jury.
24      Q.     How many police officers were
25 involved? Strike that.

**11**

1      How many police officers stood trial
2 with you?
3      A.     Five including myself.
4      Q.     Was one of those individuals Sergeant
5 Venancio?
6      A.     Yes.
7      Q.     Do you remember if Sergeant Venancio
8 had been dismissed as a defendant prior to the trial
9 starting?
10      A.     No, that's not sticking out. We were
11 all found not guilt.
12      Q.     You remember there being five police
13 officers that stood trial together?
14      A.     I couldn't say as far as being pulled
15 apart. I do remember the ending.
16      Q.     You remember there being five of you?
17      A.     Yes.
18      Q.     After the end of that trial were you
19 reinstated?
20      A.     Yes, we were.
21      Q.     As a result of that reinstatement did
22 you receive any of your back pay?
23      A.     Not me. I personally had to work so
24 I didn't receive back pay.
25      Q.     Did you have a job during the time

Silas Smith   5/4/10                                              Stevens v. City of Newark

---

**12**

1  you were suspended for two years?
2       A.      Yes, I did.
3       Q.      What was that job?
4       A.      I required my CDL license and I drove
5  tankers for Sunoco.
6       Q.      Tell me what it is the Fugitive Task
7  Force does?
8       A.      We have all high risk warrants in the
9  Essex County area.
10      Q.      What constitutes a high risk?
11      A.      Well, in the last six, seven years
12  whether we knew it or not it was a gang society and
13  we were handling -- most of our targets were
14  high ranking gang members who are running for
15  shootings, robberies and/or dangerous drugs.
16      Q.      So the warrants -- you would have to
17  serve them a warrant for their arrest?
18      A.      We would hit the door early in the
19  morning or canvas the area looking for these
20  individuals in these high narcotic locations or high
21  gang and narcotic locations.
22      Q.      Can you give me an approximate year
23  range that you worked for the Fugitive Task Force?
24      A.      2003, 2006.
25      Q.      Now, explain to me with the Street

---

**13**

1  Crimes Unit what did that unit do?
2       A.      Also we were handling street load.
3  I'll give you an example.  Most of the areas that
4  you see if you're passing through Newark have sects
5  with a lot of Bloods, Crips, Netas.  This is where
6  most of the shootings are taking place, high drugs
7  and gang violence.  At roll call we are told to
8  target these areas.
9       Q.      When you target these areas, what do
10  you physically do?
11      A.      You kind of get familiar with these
12  areas, targets, individuals, body language, a lot of
13  the people that don't belong there.  Most of the
14  time when they see us coming they begin running.
15      Q.      Literally running?
16      A.      Literally.  The chirp is a chirp
17  phone, the Motorola chirp.  They have -- we call
18  them lookouts.  They are positioned in these areas
19  so as you're pulling up they're alerting their
20  bosses who normally have a place to hide, hide the
21  guns, hide the stash.  This is going on daily.
22      Q.      So when you go into these
23  neighborhoods, how is it you go in, as one patrol
24  car?
25      A.      At that time we were riding mostly

---

**14**

1  three car teams.
2       Q.      That's a deployment?
3       A.      Actually for safety because we're
4  dealing with all areas that may have just had a
5  shooting.
6       Q.      So if there are three cars
7  patrolling, approximately how many police officers
8  are in that patrol?
9       A.      Normally six guys.  If somebody is on
10  an arrest or somebody is in court, we normally try
11  to be at that time it was six guys.
12      Q.      When you say at that time?
13      A.      At that time it was Periera,
14  Gonzalez, Venancio, Nieves, Alvarado and myself.
15      Q.      You're talking about March 2007?
16      A.      The group that was together.
17      Q.      You're no longer with the Street
18  Crimes Unit so you don't know what numbers they go
19  out with at this point in time?
20      A.      No.
21      Q.      What have you done in the last two
22  years as a detective with the Narcotic Gang
23  Enforcement Division?
24      A.      I'm an investigator, plain clothes
25  and I'm mostly search warrants.  I collect evidence,

---

**15**

1  gather information.  We have actual undercover
2  police officers who are buyers.  They buy drugs.
3  They set up locations and we gather information and
4  get a warrant signed by the judge.
5       Q.      Do you patrol at all as part of your
6  job responsibilities?
7       A.      No.
8       Q.      Other than the suspension we already
9  spoke about with the Aleda case, have you been
10  suspended any other times?
11      A.      Not at all.
12              MS. BENJAMIN:  Objection.
13      Q.      Are you aware of any other Internal
14  Affairs investigations with regard to your conduct
15  on the job other than the Aleda case?
16      A.      No.
17              MS. BENJAMIN:  Objection.
18      Q.      As of March 2007 did you generally
19  work with another police officer during your patrols
20  as part of the Street Crimes Unit?
21      A.      It was normally within those six,
22  five officers.  We were a team.  That was our
23  specific team.
24      Q.      Again, it was Alvarado?
25      A.      Periera, Nieves, of course Sergeant

---

**16**

1 Venancio, Juan. Juan's last name, oh Lord. Not
2 Gonzalez.
3     Q.    Ramos?
4     A.    Ramos.
5     Q.    Other than the six individuals that
6 you generally would patrol with as of March of '07
7 in the Street Crimes Unit, was there anyone else
8 that would have been part of that group?
9     A.    It was more a detail. We didn't
10 handle jobs in the cue or dispatch. We were
11 proactive. We went to these areas and we dealt with
12 the drugs, gangs, narcotics. That was our job.
13     Q.    What was your typical shift?
14     A.    Seven to three in the morning.
15     Q.    7:00 p.m. to 3:00 a.m.?
16     A.    3:00 a.m.
17     Q.    At what point in time during that
18 shift would you be going around to these
19 neighborhoods?
20     A.    Roll call was normally six 645.
21 After roll call we're out the door with assignments.
22 The area we hit is around 7:20. If things were
23 going the right way.
24     Q.    How long typically would you be in
25 the field for?

**17**

1     A.    According to which days. Once we
2 were assigned to whatever area they tell us to go
3 to, 416 sector, that sector as soon as you hit that
4 area it was just nonstop. It is nonstop. A lot of
5 the area shoot things occur while we're there.
6     Q.    I'm trying to figure out time-wise
7 during a typical shift 7:00 p.m. to 3:00 a.m. how
8 long would you typically be in the field?
9     A.    On a regular night we have an arrest
10 within the first hour.
11     Q.    You would be out the entire time?
12     A.    No, once you make the arrest you go
13 back and then another location.
14     Q.    You make an arrest, bring that person
15 back to the station and then go back out again?
16     A.    Yes.
17     Q.    Did you keep track of how many people
18 you arrested when you were on the Street Crimes
19 Unit?
20     A.    No.
21     Q.    Do you know if anybody kept track of
22 that?
23     A.    The back office.
24     Q.    Do you know if there was any sort of
25 award or compensation for how many people you

**18**

1 arrested?
2     A.    I wish. Did I say that? I'm sorry.
3 No.
4     Q.    Do you remember an individual named
5 Mark Stevens who you arrested on March 24, 2007?
6     A.    Yes.
7     Q.    Prior to that date had you ever met
8 or seen Mr. Stevens before?
9     A.    Never.
10     Q.    Tell me how it was that you came to
11 encounter Mr. Stevens on that date?
12     A.    Traveling south on South 14th Street
13 at the time listed and we noticed a silver or gray
14 two door Nissan sports car sitting by a fire hydrant
15 heavily tinted.
16     Q.    Meaning the windows were heavily
17 tinted?
18     A.    You couldn't see inside.
19     Q.    You were in one of the patrol cars?
20     A.    Yes.
21     Q.    Were you driving?
22     A.    No, I was a passenger.
23     Q.    Did the two patrol park?
24     A.    Yes. I would take the corner, the
25 left corner panel and the other vehicle used to

**19**

1 block off because a lot of times in these areas if
2 you don't block them off, they're going to take off.
3 We deal with stolen cars daily.
4     Q.    So you block the vehicle --
5     A.    We were doing tactical driving.
6     Q.    Did you get out of your patrol car?
7     A.    Yes, I did.
8     Q.    Where did you go?
9     A.    I went to the passenger side.
10     Q.    Did anyone else go to the passenger
11 side?
12     A.    Minutes later Dave Nieves I saw him.
13 He was on my side with me.
14     Q.    Who was driving your patrol car?
15     A.    Carlos Alvarado, my partner.
16     Q.    Where did officers Alvarado go after
17 exiting the patrol car?
18     A.    The driver's side.
19     Q.    As you approached the passenger side
20 did you see anything? Could you see into the car at
21 all?
22     A.    We saw movement and that's how we
23 knew we had people in there so we used our
24 flashlights.
25     Q.    With your flashlights were you able

Silas Smith   5/4/10                                    Stevens v. City of Newark

**20**

1  to see in the car.
2       A.      We were still having problems until
3  the driver put his window down a little bit and
4  Alvarado had the conversation asking him to lower
5  his window more.
6       Q.      Did you hear anything that the person
7  seated in the driver seat was saying to Alvarado?
8       A.      No, because the passenger already
9  started talking for him, yelling across at Alvarado.
10      Q.      Did you hear what the passenger had
11 said?
12      A.      Why are you here, why are you messing
13 with us, we're not doing anything, rambling.
14      Q.      You were able to hear that through
15 the crack in the window?
16      A.      From that side.  That's when I'm
17 tapping asking him to let this one down which he did
18 a little bit so I could get -- enough to get my
19 flashlight so I can see the interior of the vehicle
20 to make sure there are no weapons for our safety.
21      Q.      When you looked in the window into
22 the interior, did you see any weapons?
23      A.      I saw the passenger's right hand
24 brushing.  So I'm like okay, I said what's going on
25 there.  I said put your window down.  He refused to

**21**

1  put his window down.  Then he put it down a little
2  more and then I noticed the floorboard.  His
3  position he was leaning talking this way, but he's
4  breaking stuff with his foot.  He was doing this
5  (indicating).
6       MS. BENJAMIN:  You have to explain.
7       A.      Well, what's happening is you're
8  sitting in the car, the passenger seat.  He's
9  leaning on the arm -- the center console and he's
10 breaking items with his right foot.
11      Q.      Did you hear anything breaking during
12 this time?
13      A.      Immediately I signaled my partner to
14 let him know what I got.  Popped the door, excuse
15 me, sir, step out.  For what, for what.  It became
16 confrontational verbally.
17      Q.      Before you get there, I want to back
18 up a second just to see what you can remember.  You
19 have an independent recollection of this particular
20 incident, correct?
21      A.      Oh, yes.
22      Q.      Is there a reason why you remember
23 this incident?  I assume you've encountered many
24 individuals?
25      A.      This is what I do for a living.  I'm

**22**

1  trained.  I have a pretty good memory on stuff like
2  that particular situation.  Other things don't stick
3  out but that one does.
4       Q.      Now, when the window was cracked open
5  and you were looking inside, you were able to see
6  this individual -- you said brushing?
7       A.      Yes.
8       Q.      Can you explain what you mean by
9  that?
10      A.      Do you see where my hand is?  This is
11 what I'm saying.  I'm seeing more like this, which
12 is what I'm looking at.
13      Q.      You're using your hand from your
14 groin area moving it away?
15      A.      Pushing it onto the floor.
16      Q.      Did you see any items drop?
17      A.      Yes.
18      Q.      What did you see drop?
19      A.      We later found out what I thought was
20 to be vials of crack cocaine.
21      Q.      Vials?
22      A.      Two broken on the floor and one vial
23 I was able to salvage?
24      Q.      Later on you saw two broken vials on
25 the floor?

**23**

1       A.      Exactly.
2       Q.      And one that was not broken?
3       A.      Which I was able to recover, exactly.
4       Q.      Now, while the window is still
5  cracked open, did you see any other type of movement
6  other than what you just described?
7       A.      No.  At that point I know he's going
8  to jail.  At that point I'm attempting without
9  alerting him to get him out of the vehicle.  Once he
10 actually popped the door, I'm not sure he was
11 planning on getting out, but once he popped the door
12 I opened the door.
13      Q.      So whoever was sitting in the
14 passenger seat opened the door himself prior to you
15 opening the door?
16      A.      Yes, along with yelling through that
17 maybe much of a window.
18      Q.      What was he yelling?
19      A.      F, fuck, every occurs word you can
20 think of.  He went from zero to a hundred.
21      Q.      Did you attempt to open that door
22 prior to the passenger opening it?
23      A.      No.  Once he did pop the door I
24 opened it right up.  I stepped right in the middle
25 so I can have him come out because I didn't want him

**24**

1  try to get away before I could --
2      Q.     I'm going to get there.  I want to
3  take it step by step.  Prior to him opening the door
4  did you attempt to open the door yourself?
5      A.     I would think so.  I can't remember
6  what I did exactly, but once that door was popped,
7  the door was open.  Whether I did it or he did it,
8  that's when I was confronted with him face-to-face.
9      Q.     So you don't have a recollection
10  whether the door was locked prior to him opening the
11  door?
12     A.     No.
13     Q.     How wide of an opening was the window
14  when you looked in to see this activity?
15     A.     I was able to stick my flashlight
16  with my hand to illuminate the area because he would
17  never let it come all the way down.  He kept it
18  maybe --
19     Q.     When you were observing this brushing
20  with the hand and sort of stomping with the foot on
21  the floor --
22     A.     Mashing.
23     Q.     Mashing on the floor with the
24  passenger's foot this is while the window is cracked
25  open?

**25**

1      A.     Yes.
2      Q.     Were you able to see any activity in
3  the car prior to the window being cracked open?
4      A.     No.  Just movements.  At that point
5  we knew we had people in the vehicle because that
6  heavily tinted once we got close enough to use the
7  flashlights we saw people moving around.
8      Q.     Where was this vehicle parked?
9      A.     Near a fire hydrant on South 14th
10  Street facing south between 16th and 15th Avenue.
11  Midway.
12     Q.     It was in front of a fire hydrant?
13     A.     Yes.
14     Q.     Other than what you've already told
15  me, did this passenger say anything else to you or
16  the other officers?
17     A.     He said a lot.
18     Q.     While still in the car?
19     A.     Yeah, why are you here, leave us
20  alone, while the brother is saying take it easy.
21  His brother is really cooperating.  No, they ain't
22  supposed to be doing this.  I'm going to talk
23  exactly -- they ain't supposed to do this, more of
24  that.  Instead of you know here's our stuff let's
25  keep going.  He was really nasty.

**26**

1      Q.     So the person in the driver's seat
2  was the brother of the individual in the passenger
3  seat?
4      A.     Later found out to be, yes.
5      Q.     The person in the driver's seat was
6  Phillip Stevens?
7      A.     Yes.
8      Q.     The person in the passenger seat was
9  Mark Stevens?
10     A.     That's right.
11     Q.     Had you ever encountered Phillip
12  Stevens prior to this day?
13     A.     Never.
14     Q.     Had you ever encountered Mark Stevens
15  prior to this day?
16     A.     Never.
17     Q.     How frequently would you have
18  patrolled that area of Newark over the years that
19  you were with the Newark Police?
20     A.     I can't answer.  I wouldn't know.  If
21  I can say a lot, a lot.
22     Q.     You had been there many times before?
23     A.     Yes.
24     Q.     You knew what was going on in that
25  neighborhood?

**27**

1      A.     Yes.
2      Q.     Was that a high crime area?
3      A.     Yes, it was.
4      Q.     What type of crimes would you
5  generally encounter in that area?
6      A.     Heavy Bloods gang area, a lot of
7  heroin and cocaine and marijuana actually.
8      Q.     Is there something about the Bloods
9  gang that allows you to know part of the Bloods gang
10  the way they present themselves?
11     A.     During that time they were wearing a
12  color.  Still a lot of red being worn, particularly
13  a bandana hanging on the right or the rear pocket.
14     Q.     Anything with regard to their hair
15  style or anything of that nature that would allow
16  you --
17     A.     The dreads -- no, no.  Sometimes --
18  it's the color that would stick out.  Now we later
19  found out they shared the block with the Crips.  The
20  Crips didn't wear colors.  That's from intel and
21  learning.
22     Q.     So now we're at the point where the
23  passenger's window is cracked open and that
24  passenger finally opens the door, correct?
25     A.     Yes.

Silas Smith   5/4/10                                                                    Stevens v. City of Newark

---

**28**

1    Q.    Without going any further at that
2  point -- I understand the brother Phillip Stevens
3  was saying to Mark Stevens to calm down?
4    A.    Yes.
5    Q.    Did he say anything to the police
6  officers that you heard meaning Phillip Stevens?
7    A.    Nothing stuck out.
8    Q.    At that point in time when the
9  passenger opened his door where was Phillip Stevens?
10   A.    He was still -- I really can't
11 remember because when it was all over he was outside
12 the vehicle standing face-to-face with Alvarado on
13 the driver's side so I'm thinking they were both
14 getting out at the same time.  I don't remember
15 exactly when he got out because when my situation
16 was done he was out of the vehicle.
17   Q.    So now, the passenger Mark Stevens
18 opens his door.  Now explain to me what happened?
19   A.    He attempted to run past me forcibly
20 with his head down and that's when the arrest took
21 place, the handcuffing took place.
22   Q.    So tell me physically the best you
23 can remember you said Mr. Stevens, the door cracked
24 open and then you moved to open the door further?
25   A.    I actually stood in the door -- I'm

**29**

1  standing in the door.  Once I actually got it open
2  my body and him he's literally the midsection when
3  he stood up he brushed passed me his head hitting
4  this part of the body which I was taken back.
5           MS. BENJAMIN:  Describe what part of
6  your body.
7    Q.    You're pointing to your chin?
8    A.    My chin and chest took the brunt.  I
9  remember smelling his hair.  Whatever he had on his
10 hair I could actually smell it.
11   Q.    You got hit in the chin and chest
12 area?
13   A.    The chin and chest area because he
14 was in this position.
15   Q.    You're standing in the doorway,
16 Mr. Stevens is sitting.  He goes from a sitting
17 position in the passenger side and hits your chin
18 and chest area?
19   A.    Exactly.
20   Q.    With what part of his head?
21   A.    He had heavy dreads so it would be
22 this part of his head.
23   Q.    You're talking about the top part of
24 his head?
25   A.    Exactly and his forehead.

**30**

1    Q.    What happens to your body as a result
2  of that contact?
3    A.    Well, I use his body so I wouldn't
4  fall and we both went to the ground.  When I pushed
5  him on the ground, I grabbed his arm with my weight,
6  leaned on top of him and handcuffed him.
7    Q.    So you used the force of his body
8  coming at you --
9    A.    Because if I was off balance he would
10 knock me to the ground.
11   Q.    So you used the force of his body
12 coming at you to put him on the ground?
13   A.    Yes.
14   Q.    Was he -- did he ever fully stand up
15 in an upright position?
16   A.    No.
17   Q.    Did he attempt to hurt you in any way
18 meaning with his hands or fists?
19   A.    By doing that if he had hit my lip it
20 would have been busted.
21   Q.    Not if.  I want to know what he
22 actually did?
23   A.    No, no.  I wasn't hurt.  I was hit.
24   Q.    What were you hit by?
25   A.    His head.

**31**

1    Q.    My question was did he try to hit you
2  with his hands or fists in any way?
3    A.    No.
4    Q.    Now, you indicated that he attempted
5  to run past you?
6    A.    Yes.
7    Q.    How much space, if any, was between
8  where you were standing in the doorway that would
9  allow him to run past you?
10   A.    The force that he was using, if I
11 wasn't there, he would have easily run past us.  He
12 used force to get out of the car.  Normally you do
13 one of these.  It was one of these (indicating).
14   Q.    In order to run past you he had to
15 come into contact with you?
16   A.    Exactly.
17   Q.    Because you were standing in the
18 doorway?
19   A.    Yes.
20   Q.    Were you wearing a uniform at the
21 time?
22   A.    Yes.
23   Q.    When you had looked through the
24 mirror before the door opened, I assumed that you
25 identified yourself --

---

Silas Smith   5/4/10                                                    Stevens v. City of Newark

---

**32**

1    A.    The window.
2    Q.    The window, I'm sorry.  When you
3  looked through the window and part of the door
4  opening you identified yourself as a police officer?
5    A.    Yes.  We have our police car
6  illuminated with lights, we have partner saying how
7  are you doing, Officer Alvarado, can I see your
8  license, registration and insurance and no, what do
9  you need that for.
10    Q.    Who said what do you need that for?
11    A.    The passenger.
12    Q.    Were you wearing a police hat?
13    A.    No.  I have on the jacket we wear is
14  the police logo here.  Our shirts have the police
15  patches and we have large police on our back in
16  black and yellow.
17    Q.    How tall are you?
18    A.    Five-eleven.
19    Q.    Now, would it be fair to say you're a
20  pretty physically strong person?
21    A.    Yeah.
22    Q.    Were you about this size back in
23  March of 2007?
24    A.    I may have been a little bit more
25  harder.

---

**33**

1    Q.    You may have had more muscle tone
2  back in March of '07?
3    A.    Yes.
4    Q.    Did you weigh more back in March of
5  '07 than you do now?
6    A.    Maybe about seven pounds.
7    Q.    How much do you weigh now?
8    A.    250, 248.
9    Q.    So back in March of '07 you were --
10    A.    Close to 260.
11    Q.    You said at some point that Officer
12  Nieves was near you?
13    A.    Yes.
14    Q.    At the point in time that
15  Mark Stevens exited the vehicle, where was Officer
16  Nieves?
17    A.    Toward my left.
18    Q.    Toward the back of the car?
19    A.    No.  The car is facing in this
20  direction.  Stevens exited the door here.  Nieves
21  was standing on that side of the door.
22    Q.    Just so the record is clear the way
23  that car was facing, Mr. Mark Stevens exited the
24  vehicle moving toward the back part of the car?
25    A.    Yes.

---

**34**

1    Q.    And Officer Nieves was standing
2  toward the front part of the car?
3    A.    There you go.
4    Q.    So when the car door opened would
5  Officer Nieves have been between -- sorry, the car
6  door would have opened and Officer Nieves would have
7  been on the opposite side of the car door?
8    A.    The car door was between Nieves and
9  myself.
10    Q.    How much time elapsed between the
11  time that Mark Stevens first cracked open the door
12  until the time you put handcuffs on him?
13    A.    Seconds.  The struggle, until I was
14  able to control him within a minute he was
15  handcuffed, a minute or two.
16    Q.    So the way you would describe it,
17  from him attempting to run past you to the point in
18  time he was on the ground was almost as if it was
19  one full movement?
20    A.    Exactly.
21    Q.    Did you see Mr. Stevens, Mark
22  Stevens, strike his face or head in any way on the
23  ground?
24    A.    Not -- no.  More if anything the
25  chest.

---

**35**

1    Q.    Did you see Mr. Stevens injure
2  himself in any way on his face?
3    A.    No.
4    Q.    Did you see any blood coming out of
5  his face?
6    A.    None at all.
7    Q.    At any point in time between the time
8  he was in the vehicle to the time that he was on the
9  ground did you grab hold of Mr. Stevens in any way?
10    A.    To handcuff him, yes.  I used minimum
11  force to affect an arrest to bring him to the
12  ground.
13    Q.    At any point in time did you lift him
14  or remove him from the vehicle he was seated in?
15    A.    No.
16    Q.    At any point in time did you use your
17  head to strike him in any way?
18    A.    No.
19    Q.    At any point in time did you use your
20  hands to strike him in any way?
21    A.    No.
22    Q.    Was Mr. Stevens trying to physically
23  avoid allowing you to put the handcuffs on him?
24    A.    Yes.
25    Q.    Did you do anything to permit you to

---

**36**

1     put the handcuffs on him?

2     A.     Once I was able to grab his wrists I

3     was able to maneuver and pull it, a handcuffing

4     technique. I bring the first arm around and then I

5     asked him to give me the second arm. He was safely

6     and successfully handcuffed.

7     Q.     What was he doing with his arms to

8     prevent you?

9     A.     He wouldn't give it to me at that

10     point and then finally for some reason he just gave

11     me it. He was down, you know. I remember getting

12     one hand cuffed and waiting to get his other hand.

13     Q.     Tell me when he's on the ground when

14     this is happening what part of your body is in

15     contact with him?

16     A.     My knee is in his back area.

17     Q.     Which knee?

18     A.     My right knee.

19     Q.     Were you using either of your hands

20     to also hold him down?

21     A.     More of a leaning like this to grab

22     his hand and once I got his hand I was able to get

23     up and take the other hand.

24     Q.     You're saying you were leaning with

25     your right elbow?

**37**

1     A.     Yes, in his back.

2     Q.     You would have used your left hand to

3     grab his wrist to handcuff him?

4     A.     Yes.

5     Q.     Are you right or left-handed?

6     A.     I'm righty.

7     Q.     After the handcuffs were on him what

8     did you do?

9     A.     We asked him for his information. At

10     that point he's still cursing and yelling and he was

11     placed in the rear of our marked patrol vehicle.

12     Q.     Was anyone else in the rear of your

13     marked patrol vehicle?

14     A.     Yes.

15     Q.     Who?

16     A.     I don't know his name, but another

17     gentleman we had just arrested.

18     Q.     What did you arrest that gentleman

19     for?

20     A.     Possession of cocaine.

21     Q.     How was he carrying that cocaine?

22     A.     In his right hand.

23     Q.     The other individual?

24     A.     Yes.

25     Q.     Did he have it in a bag or vial?

**38**

1     A.     No. I would say we got lucky. When

2     we hit the corner of 14th Avenue, South 14th Street

3     -- the 14th Avenue area is a building which has a

4     glass door which we normally wait for buyers to come

5     out of. As we were pulling up he was coming out.

6     So he became startled as we approached him and it

7     was in is right hand.

8     Q.     He wasn't holding powder in his hand?

9     A.     No, I'm sorry, he had a vial of

10     cocaine in his right hand.

11     Q.     Was it crack cocaine?

12     A.     Yes.

13     Q.     Did you test that crack cocaine from

14     that individual?

15     A.     Yes, we did.

16     Q.     It tested positive?

17     A.     Positive.

18     Q.     How do you test crack cocaine?

19     A.     We have field testing kits that we

20     have and we break off maybe the smallest crumb

21     possibly and put it in that kit and if it turns

22     blue, it's a positive reaction.

23     Q.     Is that something during that time in

24     March of '07, that kit, is that something you

25     normally carried with you?

**39**

1     A.     No, it's in the typing area which at

2     that time would be in central processing. We have a

3     file cabinet where we keep all of our items for

4     testing.

5     Q.     Do you remember from that other

6     individual that you arrested prior to Mark Stevens

7     if you tested the crack cocaine in the field?

8     A.     No. There was no place to do that,

9     especially -- we wait to get back to the precinct

10     safely.

11     Q.     What is the proper procedure for

12     securing the evidence after an arrest with something

13     like that vial of crack cocaine?

14     A.     The officers who takes custody of the

15     property have an area on their body or a bag to keep

16     it in.

17     Q.     How do you know what evidence you

18     collected from one person as opposed to --

19     A.     You have a person who is designated

20     for each job for property.

21     Q.     Do you remember who was designated to

22     the person you arrested prior to Mark Stevens?

23     A.     Yes. Alvarado had the arrest for the

24     first guy and I ended up with the Mark Stevens

25     arrest.

**40**

1  Q.    So at the time that the Mark Stevens
2  arrest occurred who would have had the evidence from
3  the person arrested prior to Mark Stevens?
4  A.    Alvarado.
5  Q.    How long was Mark Stevens on the
6  ground in handcuffs?
7  A.    I couldn't tell you exactly. Maybe a
8  minute, approximately two minutes.
9  Q.    Did you leave him on the ground at
10  any point in time and stand up?
11  A.    No, stand him right up and get him
12  out of there. In these areas the lounger you're
13  there the more confrontation you have with
14  outsiders. Whatever arrests we do we do not stay
15  there long, especially if the vehicle is not being
16  towed or anything. From that time from the ground
17  he was in the vehicle.
18  Q.    At any point in time did you search
19  Mark Stevens body?
20  A.    Yes.
21  Q.    When was that?
22  A.    Before placing him in the rear of the
23  vehicle for safety for weapons or anything else.
24  Q.    Do you literally pat him down?
25  A.    Yes, we actually for bulges or

**41**

1  anything that may be harmful to us.
2  Q.    Did you ask him to open his pockets?
3  A.    No, he was handcuffed.
4  Q.    Did you go into his pockets?
5  A.    I checked the outside of his pockets
6  for weapons.
7  Q.    Did you physically go into any of his
8  pockets?
9  A.    No.
10  Q.    What was he wearing?
11  A.    I couldn't tell you.
12  Q.    Do you know if he was wearing a
13  jacket?
14  A.    I couldn't remember that. March
15  maybe, but I couldn't say what he had on. I don't
16  remember.
17  Q.    Prior to putting him in the patrol
18  car did you have a conversation with any of the
19  other police officers?
20  A.    Nothing that sticks out, no.
21  Q.    After Mark Stevens was in handcuffs
22  where was Phillip Stevens?
23  A.    Driver's side receiving summonses
24  from Carlos Alvarado.
25  Q.    What was the summons he received?

**42**

1  A.    I remember tinted windows and fire
2  hydrant.
3  Q.    I'm going to show you what was marked
4  as P-2 for identification. It's a summons, correct?
5  A.    Uh-huh.
6    MS. BENJAMIN: Yes?
7  A.    Yes.
8  Q.    It's a summons to Mr. Stevens for
9  unclear plates?
10  A.    Yes.
11  Q.    Do you remember him receiving a
12  summons for that?
13  A.    Yes.
14  Q.    Do you remember if his plates were
15  unclear?
16  A.    Yes.
17  Q.    Does that help refresh your memory as
18  far as what type of summonses he's received?
19  A.    No. If you look it's a totally
20  different date.
21  Q.    What date is that?
22  A.    This is August 23rd of that year.
23  Q.    So you remember him getting a summons
24  for tinted windows?
25  A.    That was for unclear license plate.

**43**

1  Q.    You remember Phillip Stevens getting
2  summonses on March 24, 2007 --
3  A.    Yes.
4  Q.    For tinted windows --
5  A.    And fire hydrant.
6  Q.    -- and fire hydrant.
7    After you put Mark Stevens in the
8  patrol car did you get into the patrol car yourself?
9  A.    Yes.
10  Q.    Did you search the vehicle that
11  Phillip Stevens was -- strike that.
12    The silver two-door car, did you
13  search that car at any point in time?
14  A.    Yes. At that point I realized some
15  of the other vials, I'm going to say two, two that
16  were cracked, but the one I recovered I was able to
17  use that as evidence.
18  Q.    When you went to the car to recover
19  that evidence was Mark Stevens already in the patrol
20  car?
21  A.    No. Actually that's when Nieves was
22  able to hold him. I recovered it, put it in my
23  pocket and placed him in the vehicle.
24  Q.    While Mark Stevens was in handcuffs
25  standing who physically went to the car to

Silas Smith   5/4/10                                           Stevens v. City of Newark

---

44

```
 1  recover --
 2       A.      Me.
 3       Q.      And Officer Nieves was standing next
 4  to Mr. Stevens?
 5       A.      Yes, he was holding him for me.
 6       Q.      Tell me what you saw exactly when you
 7  looked into that silver car?
 8       A.      I realized there was one full vial
 9  left and the other spots two were crunched.  I
10  recovered it and that was it.
11       Q.      When you say crunched, the glass was
12  broken?
13       A.      Yes.
14       Q.      Was there any substance on the
15  ground?
16       A.      They were both smashed in the carpet
17  unrecoverable.  It was just powder then.
18       Q.      Was it white powder?
19       A.      Yes.
20       Q.      Did you see the lids to the vials?
21       A.      No.
22       Q.      What type of lids would have been on
23  these vials?
24       A.      A plastic cap.
25       Q.      A black cap?
```

45

```
 1       A.      A plastic cap.  I'm not sure of the
 2  color, but the vials, the way they are constructed
 3  you pop the caps on.
 4       Q.      They don't screw on?
 5       A.      No.
 6       Q.      Did you recover any of the crushed
 7  items that were on the floor?
 8       A.      No.  I would have cut my hands.  No,
 9  you don't try to recover nothing like that because
10  now it gets in your system.
11       Q.      If you touch that material, it can
12  get into your system?
13       A.      Yes, and break out, yes.
14       Q.      Is there some sort of police
15  procedure to recover that evidence if necessary?
16       A.      No.
17       Q.      Well, would you have recovered the
18  mat and taken the whole mat in?
19       A.      I would have, but now we're talking
20  glass mixed with dirt.  I would have to have the
21  dirt or items in there, fabric, which is not good
22  because that testing kit is real sensitive.  Now I'm
23  putting dirt and everything else in there.  It
24  wouldn't be worth it.  I had a full one.  I had what
25  I needed.
```

46

```
 1       Q.      Up to that point in time did your
 2  skin ever come into contact with crack cocaine?
 3       A.      Yes.
 4       Q.      What type of reaction did you have?
 5       A.      More of an itch.  It feels full and
 6  tight.
 7       Q.      Now, what were the charges filed
 8  against Mark Stevens?
 9       A.      Possession of CDS cocaine and
10  resisting arrest.
11       Q.      There were from what you saw both wit
12  Mr. Stevens and you saw in evidence there were three
13  vials at one point in time?
14       A.      Yes.
15       Q.      Now, if you had recovered three
16  vials, would you have been able to charge him with
17  distribution?
18       A.      No, it's under ten.  That's personal
19  use for what we do, my appearance in court.
20       Q.      Under ten what?
21       A.      Under ten vials is possession unless
22  I'm seeing him actually distributing.
23       Q.      Other than looking at that front
24  passenger seat on the ground, did you search any
25  other part of the car?
```

47

```
 1       A.      Yes, I did.
 2       Q.      Where?
 3       A.      Under the seat.  At this point I'm
 4  looking for weapons.  That's what we were doing at
 5  the time for all the shootings and the vehicle being
 6  in the city in that block that we're not familiar
 7  with normally was a problem.
 8       Q.      Explain that to me.
 9       A.      You and I could not go sit on that
10  block on that particular street.
11       Q.      Why is that?
12       A.      It's a heavily -- it's a territory.
13  It's a gang territory.  If you're not buying you
14  gotta go.  You're not allowed to walk down that
15  street unless you're part of the drug trade.  If
16  you're sitting there at night, you're somebody on
17  that block.  That block receives complaints daily
18  from people who live there that are like hostages.
19  It's bad.
20       Q.      So in March of 2007 if you lived in
21  that neighborhood you basically couldn't go out at
22  night?
23       A.      No, you can't.  Stray bullets,
24  robbery, witnessing robberies, shootings.  It was
25  bad.
```

---

### 48

1  Q.    Does the City of Newark Police
2  Department keep track of violent crimes?
3      A.    Yes.
4  Q.    Based upon neighborhood?
5      A.    Yes.
6  Q.    What neighborhood was this?
7      A.    That would be 416 sector of the West
8  District or the Fourth Bureau.
9  Q.    So after you searched under the seat
10 -- first of all what seat did you search under?
11     A.    Passenger.
12 Q.    Did you search the other side of the
13 car?
14     A.    I didn't have to.  Alvarado was
15 there.
16 Q.    Do you know if Alvarado found
17 anything?
18     A.    No.
19 Q.    No, you don't know or no, he didn't?
20     A.    No, he didn't find anything or there
21 would be more charges.
22 Q.    Did you search the trunk of the car?
23     A.    No.
24 Q.    Did you search the back seat?
25     A.    Yes.

### 49

1  Q.    Did you find anything in the back
2  seat?
3      A.    Nothing in the back.
4  Q.    Did anyone else to your knowledge
5  search any other part of the car other than
6  Alvarado?
7      A.    I don't know.  I can't recall.
8  Q.    Do you remember having have a
9  conversation with Sergeant Venancio at the scene?
10     A.    I think at that point Sergeant
11 Venancio was attempting to get information, his name
12 and that's when he was yelling I'm not giving you my
13 information.  At that point we realized he wasn't
14 going to give us the information on the street and
15 we got him in the car and off to the precinct for
16 the officers' safety.
17 Q.    At any point in time did you hear any
18 police officers ask Phillip Stevens whether Mark
19 Stevens had a criminal record?
20     A.    It's not sicking out.
21 Q.    Did you see any other police officers
22 use any other type of force with regard to Mark
23 Stevens --
24     A.    No.
25 Q.    -- to effectuate his arrest?

### 50

1      A.    No.
2  Q.    Was Phil Stevens arrested?
3      A.    No.
4  Q.    It your understanding that Phil
5  Stevens owned the car that was at issue here?
6      A.    I couldn't tell you.  I didn't run
7  the plate.
8  Q.    Is there a reason you can think of
9  why Phillip Stevens wouldn't have been arrested if
10 drugs were found in his car?
11     A.    Because of my personal knowledge of
12 what I saw because normally he would.  If it was
13 found in plain view, whose car is it, the person
14 operating the vehicle most times would have to go,
15 but what I saw was good enough.  It came from the
16 chair that Mark Stevens was sitting in.
17 Q.    Did you have any discussion with any
18 of the other police officers about the fact that
19 Mark Stevens should not be arrested?
20     A.    No.
21 Q.    Did anyone say well, we should arrest
22 Phillip Stevens too?
23     A.    Not at all.
24 Q.    It was just assumed?
25     A.    Assumed.

### 51

1  Q.    You arrested Mark Stevens because you
2  found drugs in the car?
3      A.    On Mark Stevens.
4  Q.    And on the ground in the car?
5      A.    Where Mark Stevens was sitting.
6  Q.    Right.  Did you have a discussion or
7  was there any discussion at the scene among the
8  police officers about whether Phillip Stevens should
9  also be arrested?
10     A.    No.
11 Q.    Did you speak to Phillip Stevens
12 after Mark Stevens was arrested?
13     A.    I can't recall.  There is no reason
14 to.
15 Q.    Do you know where Phillip Stevens was
16 standing at the time you were searching the car?
17     A.    The driver's side rear of the car.
18 Q.    Was he restrained in any way?
19     A.    At that time him an Alvarado were in
20 conversation pertaining to his credentials.
21 Q.    So Phillip Stevens wasn't restrained
22 in any way?
23     A.    No.
24 Q.    Do you know if handcuffs were ever
25 applied to Phillip Stevens?

Silas Smith   5/4/10                                        Stevens v. City of Newark

---

**52**

1   A.      I can't recall.
2   Q.      Did anyone ask Phillip Stevens to
3   come to the police station for questioning?
4   A.      No.
5   Q.      Did anyone give Mark Stevens Miranda
6   warnings?
7   A.      No.
8   Q.      Do you know if he was ever given
9   Miranda warnings?
10  A.      I don't know.
11  Q.      Would it have been your
12  responsibility to give him Miranda warnings?
13  A.      Yes.
14  Q.      But you never did?
15  A.      No.
16  Q.      Did he say anything in the car?
17  A.      A lot.
18  Q.      What did he say in the car?
19  A.      He said -- I'm going to say the word
20  fuck maybe 30 times, yelling and screaming.
21  Q.      During the time that you were in the
22  patrol car was the other individual in the patrol
23  car speaking at all?
24  A.      No.
25  Q.      Other than the cursing, did Mark

---

**53**

1   Stevens say anything else while in the patrol car?
2   A.      Curses. He's a very nasty man. I
3   thought maybe he was intoxicated.
4   Q.      Could you smell any liquor on his
5   breath?
6   A.      No. That's why I thought maybe he
7   was intoxicated with something because he wasn't
8   reasonable at all. He was very nasty.
9   Q.      Did Mark Stevens -- going back to the
10  point in time between Mark Stevens exiting the car
11  and being placed under arrest did he swing his arms
12  at you in any way?
13  A.      Resisting arrest -- when I was
14  attempting to cuff him he wouldn't give me his arms.
15  He was flailing. He wouldn't give me his arms until
16  I got one handcuff on and while swinging his hands I
17  had to grab his arm to force his arm around. It all
18  happened literally in seconds. Hands, head, push,
19  the whole thing.
20  Q.      Prior to placing Mark Stevens under
21  arrest the basis you had to effectuate that arrest
22  was witnessing him through the crack of the window?
23  A.      The cocaine, yes.
24  Q.      The basis for the arrest at the point
25  you made the arrest was having witnessed his

---

**54**

1   activity in the car as you saw it through the
2   window?
3   A.      Yes. No, with the window down.
4   Q.      With the window down?
5   A.      Yes.
6   Q.      But only partially down?
7   A.      Enough with an illuminated
8   flashlight. The cabin was illuminated.
9   Q.      But you didn't have any physical
10  evidence at that point?
11  A.      No.
12  Q.      I'm going to show you what we've
13  marked as P-1 for identification in a previous
14  deposition. If you could just take a look at that
15  for a moment. Did you prepare this police report?
16  A.      Yes.
17  Q.      Based upon reviewing this police
18  report what time did this incident occur?
19  A.      2100 hours would be 9:00 p.m.
20  Q.      If you need more time to look at
21  this, feel free. Is everything in this police
22  report accurate?
23  A.      Okay.
24  Q.      Is everything contained in this
25  police report accurate?

---

**55**

1   A.      Yes.
2   Q.      Is there a reason you did not put in
3   the fact you found crushed vials into this police
4   report?
5   A.      No. At this time saying it's a
6   reason because it wasn't being used as evidence,
7   there was no reason not to. What I had as physical
8   evidence was enough for possession.
9   Q.      Did anyone assist you with this
10  police report?
11  A.      Yeah, the team. When we make arrests
12  at that time we normally go down per arrest and one
13  person is the author, one person does the arrest
14  sheets, the CDRs and the property. We work as a
15  team so we can get back in the street fast.
16  Q.      Now, the third page here is an arrest
17  report. Who prepared this document?
18  A.      Smith/Alvarado so it looks like it
19  may have been Alvarado.
20  Q.      There is a description under the
21  event saying "Above listed was arrested after being
22  in possession of CDS." Do you see that?
23  A.      Yes.
24  Q.      Who would have written that
25  description?

---

**56**

1      A.      The person that prepared this is
2  Alvarado.
3      Q.      It indicates here that "The person
4  was resisting lawful arrest by swinging his arms
5  after lunging at the officers."  Do you see that?
6      A.      Yes.
7      Q.      Is that a fair description about what
8  happened?
9      A.      Yes.
10     Q.      At what point in time did Mr. Stevens
11 swing his arms?
12     A.      When I was attempting -- when he
13 wouldn't give me his hands.
14     Q.      The next page is a use of force
15 document?
16     A.      That's correct.
17     Q.      Did you prepare that?
18     A.      Yes, I did.
19     Q.      What is the purpose behind preparing
20 this?
21     A.      This is a contact sheet.  What
22 exactly I did and force used, what type of force was
23 used, whether it's hands or object.
24     Q.      What did you indicate here?
25     A.      I indicated you can see hands and

**57**

1  fists.
2      Q.      So that means you would have used
3  your hands and fists?
4      A.      Yes.  There is only one box for both.
5  So hands would have been if you could check off one,
6  but hands and fists is the box I checked off.
7      Q.      Did you strike Mr. Stevens at any
8  point in time with your fists?
9      A.      No.
10     Q.      There is a box at the top that you
11 checked for violent?
12     A.      Yes.
13     Q.      That would have been something that
14 you used to describe Mr. Stevens?
15     A.      Yes.
16     Q.      Let me show you what was marked as
17 P-3 for identification.  Do you recognize the
18 individual in that photograph?
19     A.      Yes.
20     Q.      Who is that?
21     A.      Mark Stevens.
22     Q.      Other than this incident, have you
23 seen Mark Stevens since the incident?
24     A.      Plenty of times.
25     Q.      Where did you see him?

**58**

1      A.      Riding by in the streets, at the
2  movie theater where I work.  I work -- I work my
3  regular job and part time for the City of Newark.
4      Q.      What other job do you have at the
5  present time?
6      A.      Are you asking me who I'm employed
7  with?
8      Q.      Do you have a job other than the City
9  of Newark?
10     A.      I work with the Newark Screens Movie
11 Theater.
12     Q.      How long have you worked there?
13     A.      Approximately five years.
14     Q.      Where is that?
15     A.      Springfield Avenue and Bergen Street
16 on the corner.
17     Q.      You work there on the weekends?
18     A.      Yes, just one day, sometimes two.
19     Q.      So you see Mr. Stevens at that movie
20 theater?
21     A.      A couple of times.
22     Q.      Did you ever used to patrol any area
23 where he lived?
24     A.      No.  I worked part time near there
25 too.

**59**

1      Q.      Where is that?
2      A.      He used to live at Pilgrim Village.
3  It's a housing complex on Bergen and Mohamed Ali
4  Avenue.
5      Q.      What did you do at Pilgrim Village?
6      A.      Security.
7      Q.      You saw him at that location also?
8      A.      Yes.
9      Q.      Have you had a conversation with
10 Mr. Stevens?
11     A.      He had one with me while I was
12 walking away several times.
13     Q.      Well, tell me the first time you can
14 remember speaking to him after the March 24, 2007
15 incident?  Do you remember where that was?
16     A.      I can't tell you exactly when it was,
17 but I remember walking through a parking lot and
18 he's yelling that's fucked up with a group of drug
19 dealers he hangs with.  That's the guy Smitty, the
20 cop, right there that's fucked up.
21     Q.      At the time that you saw him he was
22 with a bunch of drug dealers?
23     A.      One of his friends just got out from
24 the feds, Keyon Smith.  He was just released from
25 the feds.  He did two years.  That's one of his best

60

1    friends I see him with all the time.
2        Q.      This incident was in a parking lot?
3        A.      I patrol the parking lots at this
4    part-time job where I am.
5        Q.      An outdoor parking lot?
6        A.      Yes.  When you pull into the parking
7    lot, the apartments sit on top of their garage so
8    they pull in and under.
9        Q.      It's a covered parking lot?
10       A.      Yes.
11       Q.      You saw Mr. Stevens there with--
12       A.      Several times.
13       Q.      With Keyon Smith?
14       A.      Yes.
15       Q.      And you heard him yelling according
16   to you that's the cop?
17       A.      Yes.
18       Q.      Other than that description of what
19   he said, did he approach you and have a discussion
20   with you?
21       A.      I was walking through the complex.
22   He was at his mailbox and he literally followed me.
23   Can we talk.  I think there is something wrong with
24   him, but, yes, it happened.  I get that so how much
25   I'm like numb.  This happens to me pretty much every

61

1    day.  I walk out to go to court somebody approaches
2    me, Smitty, what's up dude.  That's over, handle it
3    in court.  He would not let it go.
4        Q.      Let me take you back to this parking
5    lot.  What was he saying to you?
6        A.      That I'm fucked up.
7        Q.      Anything else?
8        A.      You're a piece of shit, stuff like
9    that.
10       Q.      Anything else?  Did you have any more
11   substantive discussion other than that?
12       A.      No.  You want to know what happened?
13   I got upset and I'd leave.
14       Q.      How long was that conversation?
15       A.      He followed me for maybe two, three
16   minutes until I got back to the office.
17       Q.      When you say he followed you, you
18   were walking?
19       A.      The way the complex is set up when
20   you come out the stairs of the complex and this is
21   the garage you have to walk around 200 yards until
22   you get back to the entrance door of the rental
23   office where we normally are.
24       Q.      So he followed you while you were
25   walking from the garage to the entrance?

62

1        A.      Yes.  That's one time when he
2    actually came in contact and words I could actually
3    hear what he was saying and asking me to talk to
4    him.
5        Q.      That was about two or three minutes?
6        A.      Yes.
7        Q.      Other than saying that's fucked up
8    and things of that nature, was there any other
9    discussion?
10       A.      He said he wanted to talk to me.  One
11   day I'll be a man and talk to him.
12       Q.      Anything else that you can remember
13   that he said?
14       A.      Not at all.
15       Q.      Did you respond to him in any way?
16       A.      No.
17       Q.      Did you tell him that you weren't
18   interested in speaking to him?
19       A.      My body language was clear.  I
20   ignored him.  There was nothing to talk about.  The
21   conversation would have went nowhere.
22       Q.      Did you say anything to him at all?
23       A.      No.
24       Q.      Did you tell him to leave you alone?
25       A.      I think my facial expressions were

63

1    enough.
2        Q.      I'm just asking you if you told him
3    in any way to leave you alone?
4        A.      No.
5        Q.      What were you wearing at that time?
6    Were you in uniform?
7        A.      No, plain clothes.  It's part time
8    not through the police department.  We're not
9    required to wear a uniform.
10       Q.      Is there anything that would have
11   indicated to someone that you were doing security at
12   that location?
13       A.      Yes, everybody in the complex knew we
14   were security.  We go to meetings and we're
15   introduced to the tenant association who we are.  If
16   they have any problems, we have a phone provided to
17   us for them.
18       Q.      Did you wear anything on your body
19   that would have indicated to someone that you were
20   security?
21       A.      No.
22       Q.      That's one incident.  Other than that
23   time can you recall another situation where you
24   encountered Mr. Stevens?
25       A.      I'm going to say the movie theater

Silas Smith  5/4/10                                          Stevens v. City of Newark

---

64

1   may have been more when I'm standing or walking
2   he'll give me one of these.
3        Q.    He would nod?
4        A.    Maybe five times.  He would nod at me
5   or whatever group he's with he makes sure they know
6   who I am.
7        Q.    Other than the time you saw him with
8   Keyon Smith --
9        A.    Another drug dealer.  That one sticks
10  out because I know he was part of a federal
11  investigation I was close to.
12       Q.    Other than that time have you seen
13  Mark Stevens with any reputed gang members or drug
14  dealers?
15       A.    His brother.
16       Q.    To your knowledge has his brother
17  ever been arrested for drugs?
18       A.    His brother was arrested, did time
19  for drugs prior to our meeting.
20       Q.    Prior to March 24, 2007?
21       A.    Yes.  His brother runs -- still runs
22  the South 14th Street area along with a few other
23  Crip members or gang members.
24       Q.    It's your understanding that Phillip
25  Stevens has a role in running that area on 14th

---

65

1   Street?
2        A.    Positive.
3        Q.    He's part of the Crips gang?
4        A.    Yes.
5        Q.    Is there a reason --
6        A.    When I say -- he affiliates with
7   them.  I'm not sure exactly what he does, but he's
8   known with the Crips gang members.
9        Q.    Since March 24, 2007 are you aware of
10  any times that Phillip Stevens was arrested?
11       A.    No.
12       Q.    Do you still have any involvement in
13  patrolling or otherwise dealing with the 14th Street
14  area where this arrest of Mark Stevens occurred?
15       A.    I've made several arrests there since
16  then.
17       Q.    But is it a place that you normally
18  would go to as part of your job functions?
19       A.    It's normally a place we're assigned
20  to go to.  I've done 20 arrests there since this
21  incident.
22       Q.    When you brought Mark Stevens to the
23  police station, did you have any conversation with
24  him?
25       A.    Minimal, your name, address, date of

---

66

1   birth, at which point -- at that point Sergeant
2   Venancio had to talk to him because that's how nasty
3   he was.  Sergeant Venancio was able to get his
4   information, begin typing.  Once he prepared the
5   arrest report which would suffice, we walked him
6   over to the central processing area which is near
7   the door to the cell block, the outside door.
8        Q.    Twenty feet away or so?
9        A.    To the door which leads you into the
10  cell block.
11       Q.    How long was Mr. Stevens being
12  processed before he was taken to the cell block?
13       A.    We got his information and then sent
14  him there.  We process the information without him
15  being there.
16       Q.    Did you process the other individual
17  that was in your patrol car at the same time?
18       A.    Yes, Alvarado did the paperwork on
19  him.
20       Q.    I'm going to show you what we've
21  marked as P-6 for identification.  Take time to
22  review that.  Who prepared that report?
23       A.    Carlos Alvarado.
24       Q.    Did you have any role in preparing
25  that report?

---

67

1        A.    Carlos Alvarado.
2        Q.    I'm asking you did you have any role
3   in preparing that report?
4        A.    Other than me gathering information
5   or anything like that, I can't tell you exactly what
6   I did, but the arrest in the incident report was
7   prepared by Alvarado.
8        Q.    I'm going to ask you to keep that in
9   front of you for a moment.  This report related to
10  which individual?
11       A.    This is -- the name is going to be
12  Tyrone Davis.
13       Q.    Is Tyrone Davis the person you were
14  discussing before saying he had been arrested
15  immediately prior to Mark Stevens on March 24, 2007?
16       A.    That's correct.
17       Q.    And the time on this police report
18  for Tyrone Davis is?
19       A.    8:45.
20       Q.    8:45 p.m.  So this report is dated
21  approximately 15 minutes before the Mark Stevens
22  report?
23       A.    That's correct.
24       Q.    What type of -- what was the purpose
25  of the arrest for Tyrone Davis?

---

| 68 | 70 |
|---|---|
| 1   A.      He was in possession of one vial of | 1   have been in the rear of the patrol car with Mark |
| 2   cocaine. | 2   Stevens? |
| 3        Q.      I believe you indicated before the | 3        A.      Yes. |
| 4   officer assigned to secure the evidence for Tyrone | 4        Q.      Then also that night, I want to show |
| 5   Davis was Officer Alvarado? | 5   you another report we identified as P-5 for |
| 6        A.      That's correct. | 6   identification.  I ask you if you had any role in |
| 7        Q.      But it says at the bottom there that | 7   preparing that report? |
| 8   the CDS recovered was field tested by my partner | 8        A.      No, I had no involvement in this. |
| 9   Smith at the scene. | 9        Q.      What is the time on that report? |
| 10        A.      I see that. | 10        A.      That's 1920, 7:20. |
| 11        Q.      Did you field test that crack cocaine | 11        Q.      So that would have been before the |
| 12   at the scene? | 12   Stevens and Tyrone incident. |
| 13        A.      I can't recall. | 13        A.      That's why they weren't with us at |
| 14        Q.      Is it possible that you would have | 14   the scene.  They were at the precinct. |
| 15   performed that test? | 15        Q.      Who is they? |
| 16        A.      I could have because it was more of a | 16        A.      This is Periera.  The author is |
| 17   calmer situation possibly, but I don't remember. | 17   Periera so I'm going to assume Juan Ramos was with |
| 18        Q.      Before you had indicated typically | 18   him. |
| 19   you would test -- | 19        Q.      At the top you see the names |
| 20        A.      And take it down to the precinct. | 20   Periera/Ramos? |
| 21        Q.      So it wasn't common that you would | 21        A.      Yes. |
| 22   test the crack cocaine in the field? | 22        Q.      Periera and Ramos would have started |
| 23        A.      Unless you have the testing kits on | 23   with you that night but when they brought in this |
| 24   you. | 24   individual -- |
| 25        Q.      So from this report we can assume | 25        A.      That means they were already gone |

| 69 | 71 |
|---|---|
| 1   that you had the testing kit on you? | 1   because at 1920 Ramos had their first arrest right |
| 2        A.      Exactly. | 2   out of the pocket.  They weren't there at the scene. |
| 3        Q.      Do you remember testing the crack | 3   We all met when we went back down to the precinct. |
| 4   cocaine that you found during the Mark Stevens | 4   We all met up at the precinct when we did all the |
| 5   arrest? | 5   paperwork. |
| 6        A.      Not at all.  Definitely not. | 6        Q.      How can you tell that? |
| 7        Q.      Is there a reason you would not have | 7        A.      Because on the 802, the incident |
| 8   tested the crack cocaine that you found at the | 8   report.  I call it an 802. |
| 9   Stevens arrest? | 9        Q.      So because your name is on here what |
| 10        A.      Because in the area we were at we | 10   does that indicate to you? |
| 11   wanted to get out of there.  You don't want to stick | 11        A.      Approximately at the scene, I was in |
| 12   around. | 12   the area, you know, maybe helped handcuff the guy, |
| 13        Q.      So the third page here shows a | 13   something like that. |
| 14   picture of Tyrone Davis? | 14        Q.      You had indicated earlier that |
| 15        A.      Yes. | 15   Sergeant Venancio would have taken Mark Stevens' |
| 16        Q.      Do you recognize this individual? | 16   information at the station? |
| 17        A.      Yes. | 17        A.      Yes, because of the confrontation. |
| 18        Q.      Have you arrested him -- strike that. | 18        Q.      What report specifically would |
| 19        Have you seen him or had any contact | 19   Sergeant Venancio have completed as part of that |
| 20   with him since March 24, 2007? | 20   intake? |
| 21        A.      Not at all. | 21        A.      He would do a record management form. |
| 22        Q.      Do you know what happened to the | 22   Record management form is their name, date of birth, |
| 23   charges that were pending against him? | 23   Social Security number, height, weight.  What you |
| 24        A.      No. | 24   would see on the arrest report is the record |
| 25        Q.      So this is the individual that would | 25   management sheet.  Along with this.  This is the |

Silas Smith  5/4/10                                                    Stevens v. City of Newark

### 72

1  medical sheet.  The record management form is not
2  here.
3          Q.      Were you aware there was an Internal
4  Affairs investigation with regard to the Mark
5  Stevens arrest?
6          A.      Yes, I was summoned in and had to
7  make a statement.
8          Q.      Who spoke to you?
9          A.      I can't recall the sergeant.
10         Q.      What did you tell the sergeant?
11         A.      What do you mean what did I tell the
12  sergeant?
13         Q.      I'm assuming you had a discussion
14  about the events of March 24, 2007?
15         A.      What was the question?
16         Q.      Well, did you explain --
17         A.      He asked me like we're talking how
18  the events took place.  He was arrested for crack
19  cocaine, that was it and he did resist arrest.
20         Q.      Do you remember what you told the
21  sergeant?
22         A.      No.  Meaning not verbatim, but I
23  answered whatever questions he asked.
24         Q.      Up until the point of the Internal
25  Affairs investigation, were you aware of allegations

### 73

1  of use of excessive force by you?
2          A.      No.
3          Q.      The Internal Affairs report indicates
4  there was four allegations of excessive force.  You
5  don't have any recollection of those?
6          A.      No.  Obviously they were unfounded.
7  There's a lot of things in our folder that we don't
8  know about.  Because the allegation was made doesn't
9  mean I was aware of it.
10         Q.      Do you remember the person you spoke
11  with as being Robert Kowalski?
12         A.      Lieutenant Kowalski, yes, I do
13  remember that.
14         Q.      Does that help refresh your memory?
15         A.      Yes.
16         Q.      Do you remember what you explained to
17  him as far as the Mark Stevens arrest?
18         A.      The incident and how it unfolded.
19         Q.      Were you aware of whether -- strike
20  that.
21                 Do you know what happened to the
22  charges that were pending against Mark Stevens from
23  his arrest?
24         A.      They were dismissed.
25         Q.      At what point in time?

### 74

1          A.      I can't remember.  We actually were
2  in court, Room 101 and there was a mini trial.
3          Q.      Did you testify at that trial?
4          A.      Yes.
5          Q.      Do you remember what you testified
6  to?
7          A.      The incident report.
8          Q.      Who was prosecuting that case?
9          A.      An attorney that was with Mark
10  Stevens.
11         Q.      So Mr. Stevens' attorney wasn't
12  prosecuting?
13         A.      You said who prosecuted the case.
14  No, we had -- forgive me for saying this, a person
15  that was picked out of another courtroom without
16  having a chance to talk to and ask me questions.  I
17  don't know who the person was, but I met that person
18  five minutes before we walked in the door.
19         Q.      Was that person a prosecutor with the
20  City of Newark?
21         A.      Yes.
22         Q.      Do you know if any other police
23  officers that were present at the scene during the
24  arrest of Mark Stevens testified at that trial?
25         A.      Carlos Alvarado.

### 75

1          Q.      Were you present during his
2  testimony?
3          A.      Yes.
4          Q.      Do you remember what Officer Alvarado
5  testified to at that trial?
6          A.      No.
7          Q.      Do you remember your specific
8  testimony at that trial?
9          A.      Whatever questions were asked I can't
10  say specifically what I said.
11         Q.      Other than your testimony an Officer
12  Alvarado's testimony, were you present during any
13  other portion of that trial?
14         A.      During the testimony of Mark Stevens
15  and his brother Phillip Stevens.
16         Q.      Did you listen to his testimony?
17         A.      Yes.
18         Q.      Did you disagree with the testimony
19  from Mark Stevens during that trial?
20         A.      Totally.
21         Q.      Do you remember what he said at that
22  trial?
23         A.      I remember just being really
24  disgusted.
25         Q.      Do you remember Mark Stevens

Silas Smith   5/4/10                                         Stevens v. City of Newark

---

**76**

1   indicating that you headbutted him?
2       A.      Yes, I do remember that.
3       Q.      You disagree with that
4   characterization?
5       A.      Yes.
6       Q.      Do you remember Mark Stevens
7   indicating that he had been bleeding from his face?
8       A.      I don't remember that part.
9       Q.      Do you remember Mark Stevens
10  testifying or alleging that you called him a stupid
11  fuck?
12      A.      No.
13      Q.      Do you remember if during March 24,
14  2007 at any point in time you called Mark Stevens a
15  stupid fuck?
16      A.      No.
17      Q.      No, you don't remember?
18      A.      No, I don't talk like that.
19      Q.      How about Phillip Stevens, you said
20  you were present during his testimony at trial.  Do
21  you remember what he said?
22      A.      No, I couldn't tell you what he said.
23      Q.      Did you assist counsel for the City
24  of Newark in any way in responding to written
25  questions in this case?

---

**77**

1       A.      Yes.
2       Q.      Other than the times that we've
3   discussed as far as your encounter with Mark
4   Stevens, have you had any other conversation --
5       A.      No.  Other than walking away, maybe
6   shooing, but no conversations.
7       Q.      Now, when is the last time you
8   remember seeing Mark Stevens?
9       A.      Last summer maybe.  I had surgery in
10  July so maybe April, June.  I remember it was warm,
11  but it wasn't July.  It was before July.
12      Q.      Where were you?
13      A.      At the complex.  At the Pilgrim
14  Village housing complex.
15      Q.      Is that the time you told me he
16  followed you?
17      A.      Yes.
18      Q.      When was the last time you saw
19  Phillip Stevens?
20      A.      I haven't seen him.
21      Q.      Have you performed any investigation
22  lately where Phillip Stevens' name has come up?
23      A.      That's confidential.
24      Q.      Is there a reason you didn't give
25  Mark Stevens a Miranda warning at the time of his

---

**78**

1   arrest?
2       A.      He was yelling and screaming too
3   loud.
4       Q.      Based upon the way the arrest
5   occurred, is it your position that you used
6   appropriate force to effectuate the arrest of Mark
7   Stevens?
8       A.      Yes.
9       Q.      Other than the vial of crack cocaine
10  that you obtained from the vehicle after Mark
11  Stevens' arrest, did you secure any other evidence
12  from that arrest?
13      A.      No.
14      Q.      I'm going to show you what we've
15  previously marked as P-4 for identification.  It's a
16  document with a photocopy of a Phillip Stevens's
17  driver's license and several handwritten words.  Do
18  any of these words have any significance to you?
19      A.      No.  The Break Up, Crank, Prestige,
20  Munich, Dejavu, Love Stinks, Descent, Skeleton Key,
21  Have Eyes.
22      Q.      Do any of those have any meaning to
23  you?
24      A.      No.
25      Q.      Do you have any idea what this is?

---

**79**

1       A.      A copy of Phillip Stevens' driver's
2   license.
3       Q.      But you have no idea what any of
4   these words mean as far as their significance?
5       A.      Not at all.
6       Q.      Do they have any connection to some
7   sort of CDS issue?
8       A.      No.
9               MR. BRONSNICK:  I have nothing
10  further.
11              MS. BENJAMIN:  I don't have anything.
12              MR. BRONSNICK:  Thank you.
13              (Deposition concluded at 1:43 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

---

Silas Smith   5/4/10                                                Stevens v. City of Newark

80

1              C E R T I F I C A T E
2
3           I, LINDA M. SCHAAL, a Certified Court
4    Reporter and Notary Public of the State of New
5    Jersey, do hereby certify that prior to the
6    commencement of the examination the witness was
7    sworn by me to testify the truth, the whole truth
8    and nothing but the truth.
9           I DO FURTHER CERTIFY that the
10   foregoing is a true and accurate transcript of the
11   testimony as taken stenographically by and before me
12   at the time, place, and on the date hereinbefore set
13   forth.
14          I DO FURTHER CERTIFY that I am neither
15   a relative nor employee nor attorney nor counsel of
16   any party in this action and that I am neither a
17   relative nor employee of such attorney or counsel,
18   and that I am not financially interested in the
19   event nor outcome of this action.
20
21   *Linda M. Schaal*
     _____
22   Notary Public of the State of New Jersey
     Certificate No. XI01152
23
24
25